## WEBSTER.

P. removed from Dudley to Webster, in October, 1842, and was employed in Webster up to the time of the election in 1843, intending during all that time to remove his family to W., as soon as he could find suitable accommodations for them. He did not in fact remove them before August, 1843. It was held, that he was not a legal voter in Webster at that election.

After a report, granting to petitioners against an election leave to withdraw, had been agreed to, and the time had elapsed within which the vote could be reconsidered,

[1] 66 J. H. 248.    [2] Same, 365.

the house recommitted the report to a committee, and, after considering a new report made by them, declared the seat in question vacant.

M. applied to one of the selectmen on the morning before an election to have his name put on the list of voters. A friend applied, also, in his behalf, for the same purpose, to another selectman. Both those officers promised to put the name on the list, but omitted to do so. M.'s vote, however, was received at the poll; but upon its appearing that his name was not on the list, he was directed to remove his vote from the ballot-box, and did so. It was held, that M. was a legal voter, and that his vote was wrongfully rejected.

The election of Solomon Robinson, returned as a member from the town of Webster, was controverted by Jonathan Day and others, on the ground, that the selectmen permitted three persons to vote at the election, who had no right to vote, and who voted for said Robinson; and would not suffer three persons to vote, who, if they had been allowed to vote, would have voted against said Robinson; and that if such persons voting had not been allowed to do so, and such persons as were not allowed to vote had been allowed, the said Robinson would not have been elected.

The three persons alleged to have voted illegally were Jotham Eddy, Oliver W. Adams and Elijah Pratt.

The three persons, whose votes were alleged to have been illegally rejected, were Harvey Wood, Alvan Child and Bradford Marcy.

Jotham Eddy gave in evidence, that on the 15th day of May, 1843, he removed from Dudley to Webster, and voted for Mr. Robinson as representative, on the 13th of November, 1843.

Oliver W. Adams testified, that he removed from Southbridge to Webster, on the 15th day of May, 1843, and voted for Robinson as representative, on the 13th day of November last, at Webster.

Elijah Pratt deposed as follows: ' I came from Dudley to Webster to work, in October, 1842. I boarded during the week in the village, and returned home and spent the Sabbath with my family in Dudley and at church in Webster. I always intended to remove my family to Webster as soon as I could get a desirable tenement, but was prevented by sickness and other causes. In August or September, 1843, I purchased a house in Webster, and removed my family from Dudley to Webster on the 2d day of October, 1843; I am now in the employ of Messrs. Slaters, and have been ever since October, 1842. I voted for Solomon Robinson as representative from Webster, on the 13th day of November, 1843.'

Harvey Wood testified, that on the 13th of November, 1843, he voted in Webster for governor, lieutenant-governor and senators, and retired to the opposite side of the hall, where he was informed that they were voting for a representative to the general court at the same time ; he then repaired to the desk of the selectmen, and was about

to deposit a vote for representative, but was refused; he would have voted against Robinson.

Alvan Child deposed as follows : ' I have been a resident of Webster for several years; in November last, at the town-meeting for the choice of governor, lieutenant-governor, senators, and representative to the general court, my name was called by the chairman of the board of selectmen as a legal voter, and I supposed I was a legal voter, having paid a tax within two years. I voted for governor, lieutenant-governor, senators and representative. After I had deposited my votes, my right to vote was challenged, on the ground that I had not paid a tax assessed within two years. I then immediately paid my tax for 1843, and the selectmen turned the ballot-box and commenced calling the list of voters as before; and when they came to my name they refused to let me vote, and I did not vote. I should have voted for Calvin Chamberlain as representative to the general court from this town.'

Bradford Marcy deposed as follows : ' I removed into the town of Webster the fore part of April, 1843, from Dudley. I paid a tax assessed against me in Dudley in 1842; on the morning of the 13th of November, 1843, Mr. Dyer Freeman, one of the selectmen of Webster, asked me if I wished my name inserted on the list of voters of Webster. I told him I did want it on, saying I had not paid the tax against me in Webster, but had my receipt for the payment of my tax last year in Dudley. He, Mr. Freeman, then said, I will see that your name is put on the list of voters. Near the close of the meeting, I went to the desk of the selectmen, and the chairman of the board said my name was on the list. I accordingly deposited my votes for governor, lieutenant-governor, senators, and for a representative. He then looked for my name on the list and found it had not been inserted. He then said I must take my vote out of the boxes, which I did, supposing I must. I should have voted for Calvin Chamberlain.'

It was also given in evidence, that one James O. Tourtelott, a single person, went to Webster in September, 1842, from Connecticut, to work, boarded in Webster until the 1st of May, 1843, and then accompanied the family he had boarded with to Dudley, where he continued to board with this family till the last of August following, when the family with whom he was boarding removed back to Webster, and he accompanied them, and continued in Webster until after the election in November last.

The family, with whom Tourtelott boarded when they removed to Dudley, had no idea of making other than a temporary residence there.

Tourtelott was assessed a tax in Dudley in May last, and paid his tax there, which was the only tax he had ever paid in this state. During the four months in which he lived in Dudley, he worked in Webster, and on the thirteenth day of November last, he voted in Webster for Calvin Chamberlain as representative to the general court.

The selectmen gave in evidence, that although the name of Alvan Child was on the check list, yet as he had not paid a tax within two years, his vote was challenged, and on that ground, rejected, and his name was stricken from the list of voters; afterwards another person paid his (Child's) tax, and he again claimed his right to vote, but it was rejected, it being too late to insert his name again upon the list of voters after the poll was opened.

They likewise gave in evidence, that Bradford Marcy's name was not on the list of voters, no evidence having been brought before the board of selectmen previous to the opening of the poll that he had the requisite qualifications.

With regard to the case of Wood, the selectmen said that when his name was

called, 'he came forward and voted and his name was checked on the list, but whether he voted for representative or not we cannot say.'

The whole number of votes cast was 224, Solomon Robinson had 114, and was declared elected, 113 being necessary for a choice.

A majority of the committee on elections, to whom the subject was referred,[1] were of opinion that the votes of Eddy, Tourtelott, and Adams should have been rejected, and that the vote of Child should have been received, which would give the following result.

To the 224 votes received, add Child's, and the whole number is 225 ; deduct Eddy's, Adams's, and Tourtelott's, and 222 remain ; necessary for a choice, 112 ; Robinson had 114 ; or after deducting Eddy's and Adams's, 112.

The majority, therefore, on the 4th of March recommended that the petitioners have leave to withdraw their petition.

A minority of the committee, dissenting from the views of the majority, made a separate report.[2] This report admits that the votes of Eddy and Adams should have been rejected and the vote of Child received, but contends that the vote of Pratt also should have been rejected, and that of Marcy received. It considers Tourtellott to have been a legal voter, though in the view of the minority the question, whether he was, or was not such, could not affect the result. The argument and conclusion of the minority are thus stated :—

"Was Elijah Pratt a legal voter in Webster ? The minority are clear he was not, for lack of six months residence in Webster.

Did Pratt move to Webster, or change his 'home' from Dudley, till he moved his family ? Clearly not. No man loses an old and acquires a new residence, until his intention of changing his residence ceases to be in suspense, and becomes fixed. If the removal depends on any contingency or doubt, the residence is not changed till the contingency ceases. Pratt had his family and home in Dudley. He went to Webster to work there. He says he went 'home' to Dudley every week

[1] 66 J. H. 51.                 [2] Same, 437.

67

to his family. He intended to remove his family, provided he could get a tenement in Webster. Until he got a tenement his intention was not fixed, nor carried into effect, and no more changed his residence than if he had remained over the line in Dudley, with his family, intending to remove in case he could find a tenement in Webster.

Take a common case. A man, with a family in New Hampshire, comes to work in Massachusetts. He intends to remove his family, provided he can find work, or make a long contract, or get a house, or any other contingency. A month before an election, he makes up his mind to remove, and brings down his family. Has he had a year's residence in Massachusetts? Clearly not. He is not detached from his residence in New Hampshire, until the contingency, as to his intention of moving his family, ceases. When that ceases, and the intention is carried into effect, the residence is changed, and not before. By the same rule, Pratt had not resided six months in Webster. Suppose he had not removed his family until after the election? Would he have been a voter in Webster in 1843? Clearly not. He went to Webster to work in October, 1842. Does any one doubt that he was a voter in Dudley, in November, 1843, where it is understood he actually did vote that year? But by the rule of the majority, the moment he moved his family to Webster, in October, 1843, his residence dated back to October, 1842; the problem is, where did he reside in the mean time? If he had not moved his family, nor taken a house, his residence would have continued in Dudley, and thus Pratt, who by law was an actual resident and a voter in Dudley, in November, 1842, where his house was, is now made out by the retraction of this removal, to have been a resident of Webster, while actually a resident of Dudley; or else to get rid of this absurdity, it must be said that his residence was suspended between Dudley and Webster, from October, 1842, though he had made up his mind to move his family. This is impossible, and we ask the house to pause before they establish this loose rule of residence upon an uncertainty, while he leaves his family at home, and is making

up his mind whether to move them or not, or until he does make up his mind to remove them without any contingency, which throws all notions of a fixed domicil into confusion. Clearly then Pratt was not a voter in Webster. The same rule, by which the majority bring him in, might just as well bring in Eddy, for he bought land in Webster, with a view to build a house in 1842, and resided in Webster till he removed his family there, on the 15th of May, 1843. The committee rightfully exclude him; but if actual removal, coupled with a previous contingent but not fixed intention, as in Pratt's case, is to date back five months, why not date back Eddy's removal eighteen months?

The next inquiry is, was Marcy's vote illegally rejected? It is admitted he had all the qualifications. On the morning of the election, one of the selectmen, upon Marcy's application, promised to put his name on the list of voters. Mr. Jonathan Day testified before the committee, that on the morning of the election, he also made the request, for Marcy, to the chairman of the selectmen, to put his name on, and he said it should be on. This is positive proof, that he did all the law requires to have his name put on. The selectmen say he did not offer evidence of his qualifications, but both he and Mr. Day, for him, applied to have his name put on, and they said it should be put on; and so strongly were the selectmen impressed with the belief that his name was on the list, as the chairman had promised, that when he asked if his name was on, they said, yes, and actually received his vote.

Will the selectmen of Webster say, that they intentionally deceived Marcy? Of course not; but is a citizen, on applying to have his name put on the list, to be told by one or more of the selectmen, that his name shall go on, and while he offers to vote be told it is on, and then find it not on after all, and thus be decieved out of his vote; and the ground taken by the selectmen, that he did not offer evidence of qualifications, when they had previously told him that they were satisfied of his qualifications?

The only possible doubt as to Marcy's right to vote is, did

he waive his right by withdrawing his vote, after it was deposited; which he did by compulsion for fear of prosecution. He swears he withdrew his vote by direction of the selectmen, because he thought he must. And, in fact, if he had persisted, after he knew his name was not on, he was liable for illegal voting, his name not being on the list; for the law is explicit, that the ballot of no voter shall be received unless his name is first placed on the list.

The selectmen, after they had promised, neglected to put it on, and thus deprived him of his right to vote, which he did not lose by withdrawing his vote, but by their neglect, or refusal, to put his name on the list, without which he could not vote. If Marcy was misled, in the first instance, by the selectmen, as to putting his name on the list, and again misled by being told by them he must withdraw his vote, would it not be allowing a double wrong to sanction the rejection of his vote?

We think it impossible to come to any other conclusion, than that Pratt was not, and Marcy was, a voter. This would give the result as follows:—

| | |
|---|---|
| Whole number of votes, - . . - - - | 224 |
| Add Child's and Marcy's, illegally rejected, - . - | 2 |
| | |
| Whole number, - . . - - - | 226 |
| Deduct Eddy's, Adams's and Pratt's, - - - - | 3 |
| | |
| Whole number, - . - - - - | 223 |

Necessary to a choice, 112. Deduct from 114, for Mr. Robinson, Eddy's, Adams's, and Pratt's, 3, and he has but 111, and is not chosen. If Tourtellott's is also rejected, it makes the whole number 222, still requiring 112 for a choice. The minority therefore report the following:—

Resolved, That the seat of Solomon Robinson, the sitting member from Webster, is hereby declared vacated."

The petition was presented on the 8th of January,[1] and referred to the committee on the 11th.[2] On the 31st the com-

[1] 66 J. H. 23.  [2] Same, 51.

mittee made a report concluding with leave to withdraw,[1] which was agreed to on the 12th of February.[2] On the 17th, however, (though the house had been in session on every intervening day) the petition was taken from the files and recommitted to the same committee,[3] who on the 15th of March, again reported leave to withdraw.[4] On the 8th, the report of the minority was submitted to the house,[5] and ordered to be printed with the report of the committee. The subject was considered on the 14th of March, and the report was amended by striking out its conclusion, and inserting that of the report of the minority, the question being taken by yeas and nays, and there being yeas 161, nays 118,[6] and as thus amended it was agreed to.[7]

On the 15th of March the house ordered, that pay should be allowed to Mr. Robinson up to and including that date.[8]